■ MANHATTAN THEATRE CLUB, INC., Appellant, v BOHEMIAN BENEVOLENT AND LITERARY ASSOCIATION OF THE CITY OF NEW YORK, Respondent. — Judgment, Supreme Court, New York County (Seymour Schwartz, J.), after trial, entered September 30, 1983, dismissing a complaint for specific performance of a contract to convey real property, is affirmed, without costs. ¶ The facts are as stated in the dissenting opinion. However, we reject the notion that the concept of delivery should be confined to a contract involving a leasehold interest. As the Court of Appeals noted in *219 Broadway Corp. v Alexander's, Inc.* (46 NY2d 506, 511), the concept of delivery is not an archaic principle of property law, but rather is "fundamental to the conveyance of an interest in land." Analyzing the practicalities of the situation, in language as equally applicable to transactions in real estate as to leasehold interests, the court noted (pp 511-512): "[D]elivery serves a very practical end. It is a common practice in the contemporary business world for parties to draft and sign instruments of

conveyance prior to the time at which they intend their contemplated transaction to become irrevocable. By requiring delivery, the law facilitates the true expectations of the parties by ensuring that the interest in the property is not conveyed until that moment when the parties so intend." ¶ The dissenters see the extended delay between signing and ultimate repudiation of the contract as an indication that rejection of the contract was "only * * * an afterthought." The facts, as related in the dissent, clearly belie that conclusion. Plaintiff's attorney was made aware, contemporaneous with the notification that the contract had been signed, that there was "trouble" with the approval, clearly "bad news" for the prospects of consummation of the transaction. Plaintiff was thus put on notice of anything but a "clear intent" to convey the property interest at the time of signing. Plaintiff certainly did not have to wait two months to realize that approval of the sale by defendant's board of delegates was very much in jeopardy. Under such circumstances, armed with such knowledge, it would have been impossible for plaintiff, at any time during those two months, to have inferred or construed a delivery of the signed contract of sale. The passage of time merely made more obvious the hesitation of defendant, a state of mind clearly sought to be protected by the Court of Appeals in adhering to the requirement of delivery in *219 Broadway Corp. v Alexander's, Inc. (supra)*. In viewing the delivery concept as a manifestation of "the intent of the parties that an interest in the land is, in fact, being conveyed", the Court of Appeals, while referring to a leasehold interest, cited authorities which would apply the principle equally to the conveyance of a deed to real property. (46 NY2d, p 512.)* Where the prospective purchaser is on notice that there are doubts as to the approval of conveyance, especially where those doubts evince hesitation as to whether the transaction will be in the best interests of the conveyor's membership (see *Church of God v Fourth Church of Christ, Scientist,* 76 AD2d 712, 718, affd 54 NY2d 742), the burden of proving delivery or nondelivery shifts to the prospective purchaser (15 NY Jur [rev ed], Deeds, § 47). Manifestly, plaintiff has not borne that burden here. Concur — Sandler, J. P., Silverman and Fein, JJ.

Carro and Alexander, JJ., dissent in a memorandum by Carro, J., as follows: We would reverse the order of Supreme Court, approve the sale under the terms of subdivision (d) of section 511 of the Not-For-Profit Corporation Law, and grant specific performance to plaintiff. ¶ Both parties are not-for-profit corporations. Plaintiff has been a tenant in defendant's 73rd Street building since 1970. The rest of that five-story building goes largely unused for the simple reason that defendant has not been financially secure enough to keep the structure up to building and fire code specifications. Indeed, much of the maintenance responsibilities have been undertaken by plaintiff, beyond the requirements of its lease, as necessary for the operation of a public theatre and cabaret. Defendant's own use of the premises is limited to two rooms on the second floor — for a weekly Czech language course and a monthly delegates' meeting. ¶ In the fall of 1979, as it began the final year of its five-year lease, plaintiff became interested in expanding in order to accommodate larger audiences and a growing staff. Because of plaintiff's success at that location (over half of its audience is drawn from the Upper East Side), it originally sought to also lease defendant's adjoining facility on 74th Street, which contains a larger theatre. Some early, tentative negotiations along this line were had. But when defendant advised that it would not even renew the

---

* "The legal requirements of delivery and acceptance imposed on deeds are also placed on leases as conveyances of interests in land." (3 Thompson, Real Property [1959 ed], § 1059; see 7 Thompson, Real Property [1959 ed], § 3229: "The 'execution' of a deed means the making thereof, which includes all acts such as signing, sealing and delivering.")

existing lease and had received an offer of $1.6 million to purchase both parcels (with half a million in cash), plaintiff matched the offer under its right of first refusal contained in the lease. Later, plaintiff bettered the deal by offering an all-cash deal via the City of New York's commitment to finance the purchase (and then lease the property back to Manhattan Theatre Club). In addition, and critical from defendant's point of view, plaintiff agreed to allow defendant the continuing use of the two rooms on the second floor, at no cost. ¶ Defendant's independent appraisal of the property, presented to defendant's October, 1979 membership meeting, disclosed a value of slightly under a million and a half dollars. Attorneys for both parties began to negotiate, with a first draft being sent from plaintiff's attorney to defendant's counsel in December of 1979. At an April, 1980 membership meeting a committee was appointed to consider plaintiff's offer. Even at that time, when the offer only provided for $500,000 cash, the committee recommended approval and, by a vote of 16-0, defendant authorized its officers to enter into negotiations and a contract of sale. ¶ Plaintiff, for its part, had to obtain approval for the financing via public hearings before Community Board No. 8, the City Planning Commission and the Board of Estimate, with adoption of the approving resolution of this last body coming on March 12, 1981. Drafts of the contract were drawn by the attorneys in November, 1980, and February, 1981, the latter containing the specific guarantee for defendant's use of the two rooms as long as the building stood or if the building was restored after casualty. (The city approved this concession, as a provision within the deed of conveyance, on May 1, and it was then incorporated into the June 1, 1981 draft.) ¶ At the May 2, 1981 delegates' meeting, the proposed contract was explained and the delegates approved the sale by a vote of 11 to 4. The sale was felt to be beneficial because defendant could not afford to keep and maintain the building; the cash purchase price would allow defendant to renovate a constituent's building in Astoria and relocate there; plaintiff was the only prospective buyer who did not wish to demolish the building and would allow continued use of the two (school and meeting) rooms; and the $1.6 million offer was an excellent price in light of the building's condition and the room usage condition. In fact, the attorneys further modified the proposed contract of sale in the June 10 draft to specify the dimensions of the two rooms. ¶ The contract signing was set for June 12, 1981 at the offices of plaintiff's attorneys. Plaintiff's principal, Mr. Grove, was there, as was defendant's lawyer, but not Mr. Yochman, defendant's principal. The June 10 draft was further modified in three minor areas, as authorized by Mr. Yochman over the phone. Mr. Grove signed the contract and tendered the $5,000 down payment check to defendant's attorney. Counsel took the contract giving it to his office suitemate for delivery to Yochman the next day, when a membership meeting was to be held at the building. ¶ Yochman did receive the contract the following day, and he signed it. Twenty minutes later Yochman presided over the delegates' meeting — a tumultuous affair in which a dissident faction voiced strenuous objections to the sale. (We know what occurred there because the dissidents' attorney, now counsel for defendant, brought a stenographer along.) The sale opponents argued their cultural and sentimental attachment to the building, stating that the Manhattan location was an irreplaceable asset, the purchase price was too low and the project relocation to Astoria was undesirable. Three new members or delegates were proposed, apparently in hopes of then reballoting the approval for the sale. At this point the meeting was adjourned, and contrary to defendant's assertions, Yochman's authority as president was thus never mentioned, much less revoked. ¶ However, the now-signed contract was never delivered back to plaintiff, although plaintiff's counsel learned, two days after the fact, that Yochman had indeed signed it. That attorney testified that she was not

informed of any serious problem, but only of requests for some minor modifications. ¶ Defendant's counsel testified that he informed plaintiff's lawyer that there was "good news and bad news." The good news was, of course, that Yochman had signed; the bad news was, "There was a lot of hostility and problems back and forth." Later that day, or the next, he discussed the contract terms with Yochman, who now wanted assurance that, no matter what became of the building, defendant would have the use of two rooms "in perpetuity". Although the attorneys held regular discussions on this point over the next two months, it was not until August 6, 1981 that defendant's counsel wrote to say that there was no binding agreement. On August 19, 1981 counsel returned the $5,000 down payment. ¶ We believe plaintiff is entitled to specific performance of the contract already signed by Yochman, in his capacity as president of defendant. Initially, we note that since this is not an action to compel performance of a long-term lease, defendant's reliance upon *219 Broadway Corp. v Alexander's, Inc.* (46 NY2d 506) is misplaced. In that case the Court of Appeals (per Jasen, J.) expressly stated (p 513) that they did not "reach or consider the broad question whether, and in what circumstances, signature alone will suffice to create an enforceable contract." The court did point out (p 512), however, that "the concept of delivery is not given to precise definition or controlled by fixed formalities. It can be said, however, with as much certainty as this sometimes elusive concept permits, that a delivery of a lease so as to give it effect requires acts or words or both acts and words which clearly manifest that it is the intent of the parties that an interest in the land is, in fact, being conveyed to the lessee [citations omitted]". From this we adduce that the key factor is "the intent of the parties" and, thus, actual delivery is not essential, but may be implied. (See, e.g., *Birch v McNall,* 19 AD2d 850 ["A binding contract, however, may be made without a physical delivery of the instrument evidencing the contract."]; *Balsam v Axelrod,* 102 Misc 2d 1000, 1001-1002.) ¶ It seems clear that at all relevant times over the almost two years of negotiations, defendant manifested the requisite intent to sell the property to plaintiff. In the case of *Brown Bros. Elec. Contrs. v Beam Constr. Corp.* (41 NY2d 397, 398), where the issue was whether the "course of conduct and communications between [the parties] created a legally enforceable agreement" for electrical work, the court (per Fuchsberg, J.) (pp 399-400) discussed the proper method of gauging intent: "In accordance with long-established principles, the existence of a binding contract is not dependent on the subjective intent of either [party] [citations omitted]. In determining whether the parties entered into a contractual agreement and what were its terms, it is necessary to look, rather, to the objective manifestations of the intent of the parties as gathered by their expressed words and deeds [citations omitted]. In doing so, disproportionate emphasis is not to be put on any single act, phrase or other expression, but, instead, on the totality of all of these, given the attendant circumstances, the situation of the parties, and the objectives they were striving to attain [citations omitted]". The several approvals of the sale by the membership and the active negotiations of defendant's attorney certainly meet this test. And despite his not being present at the contract signing on June 12, 1981, Yochman's telephonic indorsement of last-minute changes shows his active participation in every detail. Even the two-month hiatus between the signing and the eventual repudiation of the agreement confirms that the intent of defendant changed only as an afterthought. As noted by the Second Department in *Church of God v Fourth Church of Christ, Scientist* (76 AD2d 712, 715, affd 54 NY2d 742), while the formalities, such as signing and delivery, are usually necessary, the "rule yields, however, when the parties have agreed on all contractual terms and have only to commit them to writing. When this occurs, the contract is effective at the time the oral

agreement is made, although the contract is never reduced to writing and signed." The present case is, of course, even more compelling since there is a signed written document to evidence the agreement. (Cf. *Church of God v Fourth Church of Christ, Scientist, supra,* at p 715: "Neither the minutes of defendant's corporate meeting at which plaintiff's offer was accepted nor the transmittal letter expressly or impliedly reserved the effectiveness of the agreement until the formal contract was signed. Accordingly, we find that the parties duly contracted for the sale of defendant's church edifice to plaintiff.") ¶ Of course, defendant is correct in arguing that no sale of its property is possible prior to court approval of the terms of the sale, as required by subdivision (d) of section 511 of the Not-For-Profit Corporation Law. It is not necessary, however, to require that a separate petition be brought for this purpose. (Cf. *Church of God v Fourth Church of Christ, Scientist,* 54 NY2d 742, 744, *supra* ["in an action for specific performance, a court of equity 'has ample power to inquire into the fairness of the contract and as to its advantage or disadvantage to the religious corporation, and to approve the proposed conveyance and direct it to be made where, upon all the facts, no valid reason appears for refusing such relief' (*Muck v Hitchcock,* 149 App Div 323, 328-329, revd on other grounds 212 NY 283 [string citation omitted])]"; see, also, 76 AD2d, at p 716.) ¶ Under the statute we are directed to assess, and be satisfied, that "the terms of the transaction are fair and reasonable to the corporation and that the purposes of the corporation or the interests of the members will be promoted" (Not-For-Profit Corporation Law, § 511, subd [d]; *Matter of Church of St. Francis de Sales,* 110 Misc 2d 511, 512). We believe both prongs of this test are well satisfied. As noted above, this sale will enable defendant to refurbish the Astoria building and expand its activities while maintaining its Manhattan language school, as well as continue to hold its monthly delegates' meeting. The price, especially at the time it was negotiated (cf. *Matter of Church of St. Francis de Sales, supra*), appears to be both fair and reasonable in light of these concessions as to the two rooms. No other prospective purchaser would have allowed this as a condition of the sales contract, much less include in the deed of conveyance an assurance that comparable space would continue to be made available should the building be voluntarily demolished and rebuilt. ¶ Lastly, we find no merit to defendant's argument that the sale cannot be consummated because of the contract provision requiring that there first be "a final determination [of the dissidents' law suit] which does not prohibit conveyance of the premises." Under the auspices of the Czech Free School, the opponents of the sale had brought an injunctive action in April of 1981. Within a month Yochman had explained the sale terms to a delegates' meeting at which the dissidents were present, and the delegates again approved the sale, by a vote of 11 to 4. On June 15, 1981 (two days after Yochman signed), Special Term denied the motion for a preliminary injunction. But in mid-July Yochman capitulated to the dissidents and agreed to take the position that the deal with plaintiff was terminated, in return for discontinuance "with prejudice" of the Czech Free School action. That lawsuit was never formally discontinued, however, presumably to allow defendant to rely upon the nonperformance of the above-mentioned condition in the contract. Unsurprisingly, the attorney for the dissidents in that action now represents defendant here. Thus, the obstacle is one which is solely in defendant's power to remove (and there has already been one judicial determination that that action was not likely to succeed). Yochman could have insisted upon a stipulation of discontinuance in July of 1981, and the issue is moot, now, anyway. The action has been abandoned. (Cf. *Wagner v Derecktor,* 306 NY 386; *Mokar Props. Corp. v Hall,* 6 AD2d 536; and cf. *Weinprop, Inc. v Foreal Homes,* 79 AD2d 987; *Matter of Heyliger,* 39 AD2d 698.) We believe defendant has, effectively, waived this

condition and must "accept performance of the contract as is [citation omitted]" (*Weinprop, Inc. v Foreal Homes, supra*). ¶ For all of the foregoing reasons, the judgment entered September 30, 1983 in Supreme Court, New York County (Seymour Schwartz, J.), should be reversed, the contract declared to be in accord with the requirements of section 511 of the Not-For-Profit Corporation Law and specific performance decreed in plaintiff's favor. [120 Misc 2d 1094.]